UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT DEWAYNE BOSLEY, JR., <br><br> Plaintiff, <br><br> v. <br><br> M. VELASCO, et al., <br><br> Defendants. | Case No.  1:14-cv-00049-MJS (PC) <br><br> **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> **(ECF No. 48)** |

Plaintiff is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. The action proceeds on Plaintiff's Second Amended Complaint charging Defendant Velasco with excessive force in violation of the Fourteenth Amendment. Pending before the Court is Defendant's motion for summary judgment, which Plaintiff opposes.[1] (ECF Nos. 48, 53.) For the reasons set forth here, Defendant's motion will be denied.[2]

---

[1] On May 23, 2016, Plaintiff filed an untimely 122-page document titled "Declaration of Robert Dewayne Bosley Jr. in Support of Denial to Defendant's Motion for Summary Judgment." (ECF No. 68.) Defendant objects to this declaration and the attachments on multiple grounds. This declaration was not considered by the undersigned in rendering this decision.  Accordingly, Defendant's objections need not and will not be addressed.

[2] This matter is before the undersigned pursuant to the consent of the parties. (ECF Nos. 4, 26.)

## I. PLAINTIFF'S CORE ALLEGATIONS

Plaintiff alleges that when he was housed at the Fresno County Jail as a pretrial detainee, he was charged by non-party Officers Sandoval and Rodriguez with delaying the feeding process, a minor rules violation. Several minutes after that situation was resolved, Defendant Officer Velasco walked over to Plaintiff and punched him in the eye and then placed his knees on Plaintiff's lower back and his elbows on Plaintiff's face. Defendant also grabbed Plaintiff's right hand and dislocated Plaintiff's "pinky" and "ring" fingers.

## II. LEGAL STANDARDS

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Wash. Mut. Inc. v. United States, 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed R. Civ. P. 56(c)(1). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and, in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010).

2

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984, and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011).

## III. ALLEGED FACTS

### A. The Excessive Force Incident

#### 1. The Incident According to Defendant

On December 14, 2013, Plaintiff was housed as a pretrial detainee in the Fresno County Jail where Defendant Correctional Officer Velasco was working. Decl. of Marti Velasco ¶ 3; Pl.'s Dep. 76:4-5.

That evening, non-party Correctional Officers Sandoval and Rodriguez were conducting the food distribution process in Pod-C, where Plaintiff was housed. Decl. of Carlos Sandoval ¶¶ 2-3; Decl. of Enrique Rodriguez ¶¶ 2-3. All inmates who intend to eat are required to be in line at the pod door before the feeding process begins. Sandoval Decl. ¶ 3; Rodriguez Decl. ¶ 3. Each inmate is required to show his wristband to the officer. Sandoval Decl. ¶ 3; Rodriguez Decl. ¶ 3.

When Officers Sandoval and Rodriguez began distributing food, other inmates lined up to receive meals, but Plaintiff was on the phone. Sandoval Decl. ¶ 3; Rodriguez Decl. ¶ 3; Pl.'s Dep. 76:14-16. Officer Sandoval asked Plaintiff to get off the phone and line up for his meal. Sandoval Decl. ¶ 4. Plaintiff did not hang up the phone, but instead cursed at Officer Sandoval. Id.

After Officers Sandoval and Rodriguez distributed the meals to the inmates in Pod-C, Plaintiff approached them and demanded his evening meal. Sandoval Decl. ¶ 5; Rodriguez Decl. ¶ 4. When the officers told Plaintiff that he would receive his meal after they finished feeding the rest of the pods, Plaintiff became argumentative. Sandoval

3

Decl. ¶ 5. At this point, Officer Sandoval opened the door to exit the pod. Id. As Officer Rodriguez followed him out and attempted to shut the door, Plaintiff pushed the door hard back towards Officer Rodriguez and the door hit him. Id. ¶ 6; Rodriguez Decl. ¶ 5.

Construing this as an act of aggression towards Officer Rodriguez, the officers immediately opened the door, grabbed Plaintiff, and pulled him out of the pod. Sandoval Decl. ¶ 6; Rodriguez Decl. ¶ 5. Plaintiff began to resist, and Officer Rodriguez applied a rear wrist lock in an attempt to gain control. Rodriguez Decl. ¶ 5. Officer Rodriguez does not remember to which wrist he applied the wrist lock. Id.

Once the officers got Plaintiff to the ground, Plaintiff got out of the wrist lock and tucked his arms under his body. Sandoval Decl. ¶ 6; Rodriguez Decl. ¶ 6. Plaintiff became generally uncooperative and combative and refused to respond to directives to place his hands behind his back. Sandoval Decl. ¶ 6; Rodriguez Decl. ¶ 6. They tried to handcuff Plaintiff but he kept moving his body and would not allow his arms to be pulled together. Rodriguez Decl. ¶ 6; Velasco Decl. ¶ 5. He also kept trying to use his legs for leverage to get off of the ground, so Officer Sandoval held Plaintiff's legs. Sandoval Decl. ¶ 7; Pl.'s Dep. at 43:21-22. Plaintiff began to squirm and scoot during this encounter.[3] Pl.'s Dep. 43:18-20.

---

[3] In an Errata Sheet that Plaintiff completed after his deposition, he sought to strike without explanation this portion of his deposition testimony. See Klar Decl. Ex. 2. Pursuant to Federal Rule of Civil Procedure 30(e)(1), any changes to a deposition testimony must be accompanied by a signed "statement listing the changes and the reasons for making them." In Hambleton Bros. Lumber Co. v. Balkin Enterp., Inc., 397 F.3d 1217, 1224 (9th Cir. 2005), the Ninth Circuit concluded the plaintiff violated Rule 30(e) when it "omitted any statement in the deposition errata explaining the corrections, despite the fact that the plain language of the Rule requires that a statement giving reasons for the corrections be included." The Ninth Circuit went on to explain that "[a] statement of reasons explaining corrections is an important component of errata submitted pursuant to FRCP 30(e), because the statement permits an assessment concerning whether the alterations have a legitimate purpose." Id. at 1224-25. "The absence of any stated reasons for the changes supports the ... concern that the [plaintiff's] 'corrections' were not corrections at all, but rather purposeful rewrites tailored to manufacture an issue of material fact ... and to avoid a summary judgment ruling in [defendant's] favor." Id. at 1226; see also Tourgeman v. Collins Fin. Servs., Inc.., 2010 WL 4817990, at *2 (S.D. Cal. Nov. 22, 2010) ("Courts insist on strict compliance with Rule 30(e)'s technical requirements, including the requirement of a statement of reasons."). Since Plaintiff failed to include a statement of reasons with the proposed changes to his deposition testimony, and since he may not now attempt to correct the error, the errata must be stricken. See id. at *2 n. 5 (rejecting offer to provide an errata sheet explaining reasons for the changes because "Rule 30(e) required [party] to submit a statement of reasons along with the original errata sheet, and the time for submitting a statement of reasons has since elapsed." (citing Fed. R. Civ. P. 30(e)(1); Blackthorne v. Posner, 883 F. Supp. 1443, 1454 n. 16 (D. Or. 1995)).

While Officers Sandoval and Rodriguez were struggling with Plaintiff, Officer Velasco, who was conducting feeding in Pod-E, responded to a call to assist. Velasco Decl. ¶ 4. When he walked out of Pod-E, he observed Officers Sandoval and Rodriguez struggling with Plaintiff who was resisting the officers. Id.

When Officer Velasco arrived, he told Plaintiff to put his hands behind his back and stop resisting. Velasco Decl. ¶ 6. Plaintiff was not yet handcuffed. Pl.'s Dep. at 77:1-4. Plaintiff did not follow Officer Velasco's instructions, and Officer Velasco then participated in subduing Plaintiff by pulling Plaintiff's arms and hands together so that Officer Sandoval could place handcuffs on Plaintiff's wrists. Sandoval Decl. ¶ 8; Velasco Decl. ¶ 6; Rodriguez Decl. ¶ 8. Officer Velasco does not remember which of Plaintiff's arms he grabbed, and he did not employ any special wrist lock maneuver when assisting with handcuffing him. Velasco Decl. ¶ 6. Because Plaintiff was resisting the other two officers, Officer Velasco asserts that the force he used was minimal and necessary to maintain the security and order of the jail. Id. ¶ 7.

After the handcuffs were placed on him, Plaintiff was lifted from the ground and taken to the inmate services room and then the infirmary for medical evaluation. Velasco Decl. ¶ 6; Sandoval Decl. ¶ 9; Rodriguez Decl. ¶ 8.

### 2.   The Incident According to Plaintiff

Plaintiff's account of the events differs. He contends that, when Officer Sandoval told him to get off the phone, Plaintiff responded civilly that he was entitled to the phone call. Opp'n at 2. When Plaintiff ended the call, he asked for his meal, but the officers denied it and closed the pod door on Plaintiff's foot and shoulder. Id. They then reopened the door and pulled Plaintiff out. Id. Officer Sandoval swiped at Plaintiff's feet to get him on the ground, but Plaintiff voluntarily lay down, placed his hands behind his back, and crossed his feet. Pl's Dep. 41:17-24. Once Plaintiff was on the ground, Officer Rodriguez grabbed Plaintiff's left arm, applied a rear wrist twist lock, and thrust his knee into Plaintiff's back. Pl.'s Dep. 42:5-14. Officer Sandoval crossed Plaintiff's legs and

5

placed them towards Plaintiff's lower back. Pl.'s Dep. 42:15-25. Plaintiff was in excruciating pain at this point, and he began to squirm and move around to alleviate the pain. Opp'n at 3.

Officer Velasco arrived after Plaintiff was already subdued by Officers Rodriguez and Sandoval. He did not say anything, but placed his knee in the middle of Plaintiff's back, used a lateral vascular neck restraint, and punched Plaintiff in the left eye. Opp'n at 3. He also grabbed Plaintiff's right arm and applied a rear wrist twist lock to the right hand, fracturing the right fourth digit and caused Plaintiff to blackout. Id. at 3-4.

### B. Plaintiff's Injuries

At the infirmary, photographs were taken of Plaintiff's hands, face, chest and back. Lara Decl. Ex. 2. Plaintiff complained of pain in his right upper arm, right wrist, and left shoulder, and there were handcuff abrasions on Plaintiff's right wrist. Bird Decl. Ex. 1 at 8. Plaintiff's right upper arm was painful on examination, it had limited range of motion, and there was swelling. The examining medical staff member ordered x-rays to rule out a fracture, prescribed ibuprofen, and provided hot and cold compresses to be used on Plaintiff's right arm for three days. Id. An x-ray taken on December 17, 2013, showed no "No fracture, dislocation or other significant abnormality" to Plaintiff's right forearm. Bird Decl. Ex. 1 at 12. Plaintiff was cleared to return to his housing. Velasco Decl. ¶ 6; Sandoval Decl. ¶ 9; Rodriguez Decl. ¶ 8.

As a result of this incident, Plaintiff claims that he sustained injuries to his left shoulder, right forearm, right wrist, right hand (fractured fourth digit and weakened fifth digit), lower back, and left eye. Pl.'s Dep. 88:9-11; Opp'n at 4-5.

Plaintiff's medical records before and after the December 2013 incident provide some perspective regarding Plaintiff's injuries.

As noted supra, there were abrasions on Plaintiff's right wrist from the placement of handcuffs. An October 10, 2014, institutional medical record notes that "Range of motion of the wrist is completely normal." Bird Decl. Ex. 3 at 63.

Also as noted supra, a radiology report dated December 17, 2013, revealed "No fracture, dislocation or other significant abnormality" to Plaintiff's right forearm immediately following the incident. Bird Decl. Ex. 1 at 12. There are no other medical records related to Plaintiff's right forearm.

Plaintiff's left shoulder injury was documented in the medical records following the December 2013 incident. There are no other medical records related to Plaintiff's left shoulder.

There are no medical records related to Plaintiff's left eye.

With regard to Plaintiff's right hand, pre-incident non-institutional records reveal he had two dislocated fingers in his right hand, including the fourth digit.[4]

On May 23, 2012, Plaintiff was examined at Community Regional Medical Centers ("CRMC") emergency room ("ER") in Fresno, California, for dislocation of the fourth digit of his right hand. Bird Decl. Ex. 2 at 29-39. The notes indicate that Plaintiff was involved in a fight and fell on his right hand, dislocating the third and fourth digits. Plaintiff was able to "pop" the third digit back in place, but required medical assistance with the fourth. Examination and x-rays showed swelling of the second and third fingers but no fractures. Plaintiff's fourth digit was set back in place by the ER staff, and he was prescribed Hydrocodone for pain management. Plaintiff was also directed to wear a splint, limit his use of his right hand, and elevate it as much as possible.

Plaintiff was seen again at CRMC on June 6, 2012, where his pain medication was renewed and he was referred to physical therapy. Bird Decl. Ex. 2 at 43. On August 22, 2012, Plaintiff was discharged from physical therapy because of his poor compliance with the treatment regimen and home exercise program and repeatedly missed appointments. Id. at 47.

On July 11, 2012, Plaintiff was seen by a plastic surgeon. Bird Decl. Ex. 2 at 45. The medical notes indicate that Plaintiff had poor function of his right hand.

---

[4] Plaintiff attributes the source of his right hand injury to a 2012 fight and a March 2014 incident in another prison.

April 2014 prison x-rays of Plaintiff's right hand were negative for fracture and otherwise normal. See Bird Decl. Ex. 3 at 66, 69.

On October 10, 2014, Plaintiff was examined for, among other things, a March 2014 injury to his right hand. Bird Decl. Ex. 3 at 63. The medical notes report: "X-ray was negative, and the injury resolved. The patient has been able to use his right hand to perform any task that he has been asked to do as a dormitory porter or in class when he is required to write and use a computer." Examination of the finger revealed: "The area where the patient complained of old injury, the patient does have some mild deformity of the fourth and the third finger without affecting the function of hand grip or grab. No tenderness."

A December 11, 2015, Chronic Care Provider Progress Note reveals that Plaintiff had surgery on his right hand in 2013 related to two dislocated fingers. Bird Decl. Ex. 3 at 59. The examining medical staff noted that "there does not appear to be significant loss of function to the right hand," which was negative for fracture and normal otherwise. See Bird Decl. Ex. 3 at 66, 69.

Between January and April 2012, Plaintiff also visited the CRMC ER multiple times for chronic low back pain for which he was prescribed hydrocodone. Bird Decl. Ex. 2 at 16-27. On March 30, 2012, Plaintiff sought a prescription refill at CMC; the examining doctor filled it but with a notation to "taper[] with no more refill." On April 27, 2012, Plaintiff returned to CRMC to refill his pain medication, but two examining doctors refused to prescribe more and refused to see him again because of his belligerent behavior.

A November 21, 2012, CRMC medical note reports "chronic back pain," abuse of pain medication, and drug-seeking behavior.

On August 22, 2013, Plaintiff returned to CRMC ER with complaints of body aches and lower back pain. Bird Decl. Ex. 2 at 51. Because of "multiple body pain" that Plaintiff claimed was a result of an assault by seven police officers on August 19, the

treating doctor prescribed norco for pain management.

On October 5, 2013, Plaintiff was seen again at the CRMC ER with a complaint of chronic back pain. Bird Decl. Ex. 2 at 53.

April 2014, prison x-rays of Plaintiff's low back were negative for fracture and normal otherwise. See Bird Decl. Ex. 3 at 66.

On October 10, 2014, Plaintiff was examined for "low back pain that has no impact on his daily activities or exercise." Bird Decl. Ex. 3 at 63. This was deemed a "[m]inor orthopedic problem that does not qualify for a low bunk Chrono."

On December 24, 2014, Plaintiff was prescribed Ibuprofen for low back pain. Bird Decl. Ex. 3 at 61.

On January 7, 2015, Plaintiff was seen for a follow-up for his low back pain. Bird Decl. Ex. 3 at 62. Plaintiff said his back pain had been "okay. It is there, but well tolerated and does not affect his daily function." Examination revealed normal range of motion.

On November 2, 2015, Plaintiff was seen at an offsite medical care provider for lower back pain, with a pain level of "8/10". Bird Decl. Ex. 3 at 60. The notes indicate that Plaintiff was last prescribed ibuprofen for the pain and it had proved "Effective."

## V. ANALYSIS

### A. Fourteenth Amendment Excessive Force

Excessive force claims brought by pretrial detainees under the Fourteenth Amendment are evaluated under the "objectively unreasonable" standard. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015). Courts apply a more rigid standard in these cases than in cases involved prisoners because pretrial detainees, unlike prisoners, must not be punished at all, much less sadistically and maliciously. Id. at 2475 (citing Ingraham v. Wright, 430 U.S. 651, 671-71 (1977)). When determining whether or not an officer's use of force was objectively unreasonable, courts must evaluate the case from the perspective of a reasonable officer on the scene at the time of the event, and

not with the 20/20 vision of hindsight. Graham v. Connor, 490 U.S. 386, 396 (1989). Courts must also balance the state's legitimate interest in maintaining order in the facility in which the individual is detained, and, where appropriate, defer to the "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 540 (1979). Courts may look at a variety of factors to determine whether the force used was objectively unreasonable, including but not limited to: the relationship between the need for the use of force and the amount of force used, the extent of the detainee's injury, the threat reasonably perceived by the officer, and whether the detainee was actively resisting. Kingsley, 135 S. Ct. at 2473.

Because assessing the need for force "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom... summary judgment or judgment as a matter of law...should be granted sparingly" in cases involving claims of excessive force. Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003). "This is because such cases almost always turn on a jury's credibility determinations." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005). "Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury; only in the absence of material disputes is it a pure question of law." Torres v. City of Madera, 648 F.3d 1119, 1123 (9th Cir. 2011) (citations and quotation marks omitted).

### B. Discussion

Defendant moves for summary judgment on the ground that the force used was reasonable and minimal under the circumstances and that Plaintiff's claims of injury are unsupported.

On review, the Court concludes that summary judgment is not warranted because the amount and type of force used by Defendant Velasco is disputed by the parties. Defendant contends he used only the minimal amount of force necessary to

secure order after witnessing Plaintiff resisting Officers Sandoval's and Rodriguez's attempts to restrain him. Plaintiff asserts that the force was excessive and unnecessary since he was already subdued when Defendant arrived and that any movement on his part was to minimize pain inflicted by the other officers. He also claims that Defendant placed his knee in the middle of Plaintiff's back, used a lateral vascular neck restraint, punched Plaintiff in the left eye, and dislocated his finger. This factual dispute precludes the entry of summary judgment.

Defendant's argument regarding Plaintiff's injuries produces no different result. Defendant submits Plaintiff's medical records to establish the existence of injuries pre-dating the December 14, 2013 incident and to show that, despite the presence of these and other injuries, Plaintiff is able to function normally. Defendant's medical expert, Dr. Ken Bird, opines that the cause of Plaintiff's low back and right hand pain cannot be attributed to Defendant, that there is no evidence of any sign or symptom of injury to Plaintiff's right wrist or forearm, and that Plaintiff has not suffered long-lasting effects as a result of any of his claimed injuries.

It is true that the medical records following the December 2013 incident do not support Plaintiff's claim that Defendant dislocated Plaintiff's finger on his right hand or that he suffered any other injury or pain in his right hand, right forearm, lower back, or left eye. It is also true that Plaintiff's lower back and right hand injuries can be attributed to other incidents pre-dating Plaintiff's encounter with Defendant, and that Plaintiff does not appear to have suffered severe or long-lasting effects from the December 2013 incident. Nonetheless, there is evidence in the record showing that, immediately following the incident, Plaintiff complained of pain in his right arm, right wrist, and left shoulder, and there were abrasions on Plaintiff's right wrist that were cleaned. Additionally, Plaintiff's right upper arm was painful and swollen on examination, and it had limited range of motion. Plaintiff's injuries, of course, need not be severe or long-lasting or even directly attributable to Defendant's conduct in the first instance in order

11

to support an excessive force claim.

In any event, the relevant inquiry is not whether Plaintiff's injuries are *de minimis*, but whether the use of force was *de minimis*. See Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) ("Injury and force ... are only imperfectly correlated, and it is the latter that ultimately counts.") The degree of Plaintiff's injuries only serves as evidence of the degree of force used, it does not conclusively resolve the question of whether the degree of force was *de minimis*. See Wilkins, 559 U.S. at 37 ("The extent of injury may ... provide some indication of the amount of force applied.") Defendant cannot escape liability for the use of force simply because Plaintiff failed to suffer long-lasting effects or any treatable injury. "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Id.; Hudson v. McMillian, 503 U.S. 1, 9 (1992) ("In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. This is true whether or not significant injury is evident.") (internal citations omitted).

This case turns on whether the force used was in a good faith effort to restore order or maintain discipline. The extent of Plaintiff's injury is a factor on determining whether the force used was excessive. Because there is a dispute about whether Plaintiff was subdued when Officer Velasco arrived and there is evidence in the record that Plaintiff suffered some injury during the incident, a reasonable jury could conclude that the quantum of force used was objectively unreasonable and that the force was unnecessary, and therefore unconstitutional.

### C. **Qualified Immunity**

Law enforcement officers are shielded from suit unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity

test comprises two inquiries, but a court may consider only the second in accordance with fairness and efficiency and in light of the circumstances of a particular case. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Under the first prong, the court considers whether the alleged facts, taken in the light most favorable to plaintiff, show that defendants' conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds in Pearson, 555 U.S. at 223. In resolving this first inquiry, the court determines whether the alleged facts, taken in the light most favorable to the plaintiff, show that defendants were reasonable in their belief that their conduct did not violate the Constitution. Wilkins v. City of Oakland, 350 F.3d 949, 955 (9th Cir. 2003) (citing Saucier). In other words, even if Defendant's actions did violate the Eighth Amendment, a "reasonable but mistaken belief that [his] conduct was lawful would result in the grant of qualified immunity." Id.; see also Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1076 (9th Cir. 2011) (noting an officer is entitled to qualified immunity for unlawful arrest if he had probable cause or if "it is reasonably arguable that there was probable cause for the arrest") (emphasis in original). Qualified immunity thus "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Here, Defendant is not entitled to qualified immunity because, viewing the facts in Plaintiff's favor, the Court cannot conclude that the amount of force used by Defendant was lawful under the circumstances. See Santos v. Gates, 287 F.3d 846, 855 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 205) ("[W]hether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend on the jury's resolution of disputed facts and the inferences it draws therefrom. Until the jury makes those decisions, we cannot know, for example, how much force was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of that degree of force was lawful."); Walker v. Jones, 2010 WL 3702659 (N.D. Cal. Sept. 16, 2010) ("Viewing the facts in the light most favorable to plaintiff, it cannot be said that a reasonable officer

13

in defendants' position would have believed that hitting, kicking and stepping on plaintiff's face after he was handcuffed was reasonably necessary to maintain discipline and order."); Rosenblatt v. City of Hillsborough, No. 12–cv05210–LB, 2013 WL 6001346, at *15 (N.D.Cal. Nov. 12, 2013) (officers were not entitled to qualified immunity for use of excessive force because "the issues of disputed fact preclude a determination at this point" on qualified immunity, and "Defendants' argument relies on their version of the facts"); McCloskey v. Courtnier, 2012 WL 646219, at *3 (N.D. Cal. Feb. 28, 2012) ("[B]ecause the facts relevant to the issue of qualified immunity are inextricably intertwined with the disputed facts relevant to the issue of excessive force, defendants are not entitled to summary adjudication on the issue of qualified immunity.").

## IV. **CONCLUSION**

Based on the foregoing, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is DENIED. A subsequent scheduling order will be issued setting this matter for trial.

IT IS SO ORDERED.

Dated:   July 19, 2016              /s/ *Michael J. Seng*
                                    UNITED STATES MAGISTRATE JUDGE